IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| RONALD JOE BYERS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.: 00-PT-0628-M |
| ) | |
| NATIONAL FOUNDATION LIFE ) | |
| INSURANCE COMPANY and ) | |
| LIFESTYLES MARKETING ) | |
| GROUP INC., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendants National Foundation Life Insurance Company ("National Foundation") and Lifestyles Marketing Group, Inc.'s ("Lifestyles") Motion for Summary Judgment filed on June 28, 2002.

**FACTS AND PROCEDURAL HISTORY**

National Foundation is a Delaware corporation engaged in the business of selling insurance, with its principal place of business in Texas. *See* Am. Compl. at ¶ 8. Lifestyles is a Delaware corporation in the business of marketing insurance products for insurance companies, including National Foundation. *See* Am. Compl. at ¶ 9. Lifestyles' principal place of business is also in Texas. At various times, plaintiffs[1] were agents of Lifestyles, employed to write and sell National Foundation insurance policies. *See* Am. Compl. ¶¶ 3-7; Def. Br. at 1-3. This controversy surrounds these business relationships.

---

[1] Plaintiffs Ronald Joe Byers and Sherry Campbell are citizens of Alabama. Plaintiffs Awilda Burkes and Billy Burkes are citizens of Mississippi. Plaintiff Levon Mulkey is a citizen of Georgia. Neither side contests the court's jurisdiction under 28 U.S.C. § 1332. *See* Am. Compl. at ¶ 2; Answer to Am. Compl. at ¶ 2.

According to the Request for Agent's Appointment, a copy of which was signed by each Plaintiff, National Foundation had "no obligation" to pay any commissions to plaintiffs. *See* Def. Exs. B, H, K, O, P at ¶ 2. Rather, plaintiffs were to be paid a commission by Lifestyles on the initial sale of each policy, as well as an advance commission on each renewal premium to be paid during the first year of the policy. *See* Def. Exs. C, D, F, G, L, R at ¶¶ 17-18. If plaintiffs had subagents, they would also receive a commission on each policy sold by a subagent and an advance commission on each renewal premium to be paid during the first year of the policy. *Id.*

The dispute here surrounds the remaining provisions of the contracts. According to the contracts, if a policy sold by plaintiffs, or one of their subagents, was cancelled before the first year of the policy expired, Lifestyles would recoup any commissions advanced for premiums that were not paid during that first year. *Id.* at ¶¶ 10, 17, 18, 22, 23. Also, according to the contracts, plaintiffs were ultimately responsible for all debit balances of their subagents. *Id.* at ¶ 10. And finally, Lifestyles had the right to (1) recoup from plaintiffs any monies paid for the defense and settlement or disposition of legal actions involving the plaintiffs, and (2) terminate plaintiffs' appointments with or without cause, provided that fifteen (15) days notice was given. *Id.* at ¶¶ 7, 20, 23. Plaintiffs allege that the defendants made oral representations inconsistent with these contractual provisions.

Levon Mulkey:

Plaintiff Levon Mulkey ("Mulkey") was appointed as an agent of Lifestyles in 1992. *See* Def. Ex. A at 21. Mulkey executed a Request for Agent's Appointment with National Foundation that same year. *See* Def. Ex. B. On May 31, 1995, Mulkey also executed Senior District Manager's Contracts with both Lifestyles and National Foundation. *See* Def. Exs. C &

D. Mulkey started as a District Manager, but was promoted to Senior District Manager. *See* Pl. Ex. F at 29, 31. Mulkey asserts that he was told by Lifestyles that agents were not responsible for the debts of subagents. *Id.* at 24, 26-27, 62-67, 72-73, 78-82, 151; *see also* Pl. Ex. G. Mulkey's appointment with defendants was terminated on March 5, 1996. *See* Def. Ex. E.

Billy Burkes:

Plaintiff Billy Burkes ("Mr. Burkes") executed a District Manager's contract with Lifestyles on October 10, 1994. *See* Def. Ex. F. Also in October 1994, Mr. Burkes executed a District Manager's Contract and a Request for Agent's Appointment with National Foundation. *See* Def. Ex. G & H. On December 20, 1996, Mr. Burkes executed a General Agent's Contract with National Foundation. *See* Def. Ex. I. Mr. Burkes was promoted from Associate District Manager, to District Manager, to Senior District Manager, to Regional Vice President. *See* Pl. Ex. D at 18-20. Mr. Burkes asserts that he was told by Lifestyles that he would not be responsible for the debts of subagents. *Id.* at 33-55; 70-73, 84, 93-94; *see also* Pl. Ex. E. Mr. Burkes' appointment with defendants was terminated in 1997. *See* Def. Ex. J at 59.

Sherry Campbell:

Plaintiff Sherry Campbell ("Campbell") executed a Request for Agent's Appointment with National Foundation on May 24, 1994. *See* Def. Ex. K. Campbell also executed a Writing Agent's Contract with Lifestyles on October 4, 1994. *See* Def. Ex. L. While an agent of Lifestyles, Campbell was named as a defendant in two separate lawsuits. *See* Pl. Ex. B at 63, 67-68. In both lawsuits, it was alleged that Campbell misrepresented the terms of a policy. *Id.* As a result, Campbell received two 1099 forms charging her account for the costs of defending and settling the lawsuits. *Id.* at 47-49. However, Campbell asserts, while at Lifestyles and National

Foundation meetings, she was informed that her Errors and Omissions insurance policy would pay the settlements. *Id.* at 72-75. Campbell's appointment with defendants was terminated in 1996. *See* Def. Ex. M at 42.

Awilda Burkes:

Plaintiff Awilda Burkes ("Ms. Burkes") executed a contract with Lifestyles when she was first appointed in 1993. *See* Def. Ex. N at 20-22. Also, she executed a Request for Agent's Appointment with National Foundation on October 4, 1993, and another on July 18, 1995. *See* Def. Ex. O & P. During her time at Lifestyles, Mrs. Burkes was appointed to District Manager. *See* Pl. Ex. C at 26. Ms. Burkes claims that while a District Manager, she was told by Lifestyles that there would be no chargebacks for any business written by agents that were under any manager. *Id.* at 27-28. Ms. Burkes asserts that she was given similar information at every business meeting she attended. *Id.* at 31-32. Ms. Burkes' appointment with defendants was terminated on May 9, 1997. *See* Def. Ex. Q.

Ronald Byers:

Plaintiff Ronald Joe Byers ("Byers") executed a Writing Agent's Contract with Lifestyles on June 29, 1995. *See* Def. Ex. R. The contract provided a vesting schedule for certain commissions, including a provision stating that after two years, certain commissions were vested for life. *Id.* at ¶ 18. Byers contends that he was terminated so that his commissions would not vest. Specifically, Byers contends that he was told by Mr. Burkes that Lifestyles informed Mr. Burkes not to let anyone else validate their contracts by being with the company for two years. *See* Pl. Ex. A. Byers was terminated on or about February 1997. *See* Pl. Ex. A.

Plaintiffs filed this lawsuit on March 10, 2000, alleging (1) tortious interference with

contractual relations, (2) conspiring to commit tortious interference, (3) breach of contract, and (4) unjust enrichment. More specifically, plaintiffs allege that (1) defendants began charging plaintiffs for the debts of the subagents, (2) defendants refused to pay commissions that were owed to plaintiffs, (3) defendants wrongfully terminated sub-agents so that their commissions would not vest,[2] and (4) defendants stopped paying renewal commissions that were due, after plaintiffs contacted another insurance company, National Health Insurance Company ("National Health"), about selling its products. *See* Am. Compl. at ¶ 14-16. In their Brief in Opposition to Summary Judgment, plaintiffs also allege that defendants contacted plaintiffs' customers and attempted to convince them to buy insurance from other agents. *See* Pl. Br. at 9.[3] Individually, it appears from plaintiffs' Brief in Opposition that Campbell, in addition to the other claims, also alleges that she was charged for the costs of defending and settling the lawsuits against her, even though she was told that her Errors and Omissions insurance would cover the costs.[4]

After defendants filed their Motion for Summary Judgment, plaintiffs amended their complaint to include claims for fraudulent inducement and promissory estoppel. As defendants' Motion for Summary Judgment could not have addressed the two added counts, this court will treat defendants' Motion as a partial motion for summary judgment.

---

[2] As to Byers, it is unclear to the court whether the vesting claim is his only claim, or if he joins in all the plaintiffs' claims. *Compare* Am. Compl. at ¶¶ 11-29 (referring to all plaintiffs collectively), *with* Pl. Br. at 2 ("Mr. Byers, however, has not raised a breach of contract claim. Rather, his allegations revolve around the fact that he was wrongfully terminated . . . just before vesting.").

[3] The court assumes that this latter claim is covered by the generalized tortious interference claim. *See* Am. Compl. at ¶ 18.

[4] The court also assumes that this claim is covered by the generalized breach of contract claim. *See* Am. Compl. at ¶ 23. Again, it is unclear to the court whether this is Campbell's only claim, or if she joins the other plaintiffs' claims regarding unpaid commissions, tortious interference, etc. Based on the deposition testimony and exhibits filed with the respective briefs, the courts assumes that Campbell joins in the plaintiffs' other claims. *Compare* Pl. Br. at 2 (discussing the lawsuits), *and* Pl. Ex. B. at 47-49, 72-75 (same), *with* Def. Ex. M at 87 (discussing breach of contract).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the

non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS[5]

### I. Tortious Interference With Contractual Relations

A. Defendants' Position

According to defendants, tortious interference requires (1) the existence of a contract or business relation, (2) defendant's knowledge of the contract or business relation, (3) intentional interference with the contract or business relation, (4) the absence of justification for the interference, and (5) damage as a result of the interference. *Ex parte Awtrey Realty Co., Inc.*, 2001 WL 1658318, *4 (Ala. Dec. 28, 2001) (quoting *Soap Co. v. Ecolab, Inc.*, 646 So. 2d 1366, 1371 (Ala. 1994). Moreover, plaintiff must prove that the defendant is a "third party" or a "stranger" to the contract with which he allegedly interfered. *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala. 2001).

Defendants assert that plaintiffs did not have a contractual relationship with their "customers" that could even be interfered with. Plaintiffs were not parties to the contracts with the customers. *See* Def. Ex. A at 40-41. Nor is there any evidence of a separate contractual or other legally protected relationship between plaintiffs and the customers.

Defendants also argue that even if the court found a contractual or business relationship between plaintiffs and the customers, defendants were not "strangers" to it. The only possible relationship between them would be selling National Foundation policies as agents of Lifestyles.

---

[5]As an initial matter, National Foundation argues, all of plaintiffs' claims center around unpaid commissions that they feel are owed to them. According to National Foundation, it is undisputed that Lifestyles, not National Foundation, owed any and all commissions to plaintiffs; thus, any claims against National Foundation for unpaid commissions must fail as a matter of law.

7

Thus, both defendants are intimately involved in these "relationships," either as a contractual party or as an employer. Indeed, defendants assert, it is hard to imagine how they could be more involved in the relationship between plaintiffs and the customers. Thus, since defendants are not "strangers" to the relationship, they cannot be liable. *BellSouth Mobility*, 814 So. 2d at 212.

As a third alternative, defendants argue that they did not take any action which they were not entitled to take, which according to defendants negates any liability for tortious interference. *BellSouth Mobility*, 814 So. 2d at 214. Defendants argue that plaintiffs are claiming that they were terminated without cause so that they would not vest under their contracts. However, the employment/agency contracts signed by plaintiffs gave defendants the right to terminate their appointments with or without cause, as along as fifteen days notice was given. *See* Def. Exs. C, D, F, G, L, & R at ¶ 20. As for plaintiffs' claims for owed commissions, defendants note under the contracts, they could recoup the advanced commissions paid to agents and subagents on unpaid premiums. *See* Def. Exs. C, D, F, G, L, & R at ¶¶ 10, 17, 18, 22, 23. Moreover, plaintiffs have presented no evidence that the recoupment was improper or that the commissions were improperly calculated. *See* Def. Ex. A. at 121 (Mulkey stating that he does not know if Lifestyles has improperly calculated commissions); Def. Ex. M at 97 (Campbell admitting that she has not done any calculations); Def. Ex. N at 41(Ms. Burkes, same). Thus, there is no evidence that defendants did anything that they were not entitled to do.

Fourth, defendants argue that the tortious interference claim is barred by the statute of limitations. Such claims are subject to a two-year statute of limitations. *See Teng v. Saha*, 477 So. 2d 378 (Ala. 1995); Ala. Code Ann. § 6-2-38 (1975). Moreover, defendants assert that there is no tolling of this limitations period. *See Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274

(Ala. 1993). Since plaintiffs' claims are based on improper termination and improperly recouping commissions, the statute has run because all plaintiffs were terminated and all advances were recouped well over two years before this action was filed in March 2000.

Finally, defendants address the claim of tortious interference with plaintiffs' relationship with National Health, for whom some of the plaintiffs went to work after their appointments with defendants were terminated. Defendants point out that plaintiffs themselves belie any contention that defendants interfered with that relationship. *See, e.g.,* Def. Ex. A. at 147 (Mulkey admitting that he never attempted to do business with National Health); Def. Ex. J. at 89 (Mr. Burkes admitting that Lifestyles did nothing to interfere with his relationship with National Health). Moreover, since plaintiffs' chief complaint is that Lifestyles still owes them commissions, it is inconceivable that this failure to pay could have interfered with plaintiffs' relationship with National Health. Thus, all of plaintiffs' claims for tortious interference fail as a matter of law.

B. Plaintiffs' Response

Plaintiffs counter that while they have received thousands of pages of commission statements, the cryptic nature of the statements prevents them from being able to calculate whether defendants have or have not paid the correct amount of commissions. Plaintiffs contend that only a corporate representative of the defendants could interpret the documents. Plaintiffs assert that they have tried to set a date and topics for a Federal Rule of Civil Procedure 30(b)(6) deposition, but have been unable to do so. *See* Pl. Ex. J. Until such a deposition is held, plaintiffs will not be able to say whether the correct amount of commissions were paid.

Plaintiffs also argue that defendants are misstating their position. Plaintiffs maintain that their tortious interference claims involve (1) defendants contacting plaintiffs' customers and

convincing them to drop their current policies and sign up for policies with another agent, and (2) defendants charging back unpaid commissions long after they promised plaintiffs that chargebacks would not occur. Thus, the date that the statute of limitations began to run would be the date that defendants contacted the customers or the date that defendants began the chargeback. Until defendants will allow a corporate representative to be deposed under Rule 30(b)(6), there is no way to know when the statute of limitations began to run.

## II.     Civil Conspiracy

### A. Defendants' Position

According to defendants, a civil conspiracy requires a "combination of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful end by unlawful means." *McLemore v. Ford Motor Co.*, 628 So. 2d 548, 550 (Ala. 1993). However, for a civil conspiracy, there must be an underlying tort. *Willis v. Parker*, 814 So. 2d 857, 867 (Ala. 2001). Defendants argue that since they did not commit tortious interference, they cannot be guilty of conspiring to do so. Thus, plaintiffs' conspiracy claim must fail as a matter of law.

### B. Plaintiffs' Response

Plaintiffs counter that they have little or no information regarding the details of the conspiracy. Unless a Rule 30(b)(6) deposition is held, plaintiffs assert, they will be disadvantaged by a lack of access to information, and prejudiced by any ruling on summary judgment.

## III.    Breach of Contract

### A. Defendants' Position

Defendants note that, as previously discussed, the contracts gave them the right to recoup

commissions and to terminate the plaintiffs with or without cause. Since plaintiffs' breach of contract claim centers around termination and recouping premiums, it must fail as a matter of law.[6]

B. Plaintiffs' Response

Plaintiffs assert that in order to prevail for breach of contract, they must show (1) a valid contract binding the parties, (2) the plaintiff's performance under the contract, (3) the defendant's nonperformance, and (4) resulting damages. *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999). According to plaintiffs, the only dispute in this case surrounds defendants' nonperformance. While acknowledging that the contract contains the terms cited by defendants, plaintiffs counter by noting that defendants promised plaintiffs that they would not be responsible for the debts of subagents. *See, e.g.,* Pl. Ex. F. at 24, 26-27, 62-67, 72-73, 78-82, 151 (Mulkey); Pl. Ex. D. at 33-55; 70-73, 84, 93-94 (Mr. Burkes); Pl. Ex. C. at 27-28, 31-32 (Ms. Burkes); Pl. Ex. H at ¶¶ 3-4 (Affidavit of Robert Byrnes, former Executive Vice-President of Lifestyles).

Plaintiffs also note that the real intent of the parties governs the legal construction of a contract. *Parr v. Godwin*, 463 So. 2d 129 (Ala. 1984). According to plaintiffs, the real intent is determined by the terms of the contract and the conduct of the parties. *Gulf Fishing & Boating Club, Inc. v. Bender*, 370 So. 2d 1026 (Ala. Civ. App. 1979). Plaintiffs argue that defendants conduct shows that they did not intend to charge plaintiffs for the debts of subagents. In addition

---

[6] Defendants also note that Campbell alleges that Lifestyles should not have charged her account for the monies spent defending and settling the two lawsuits against her. However, defendants assert that the employment/agency contracts gave Lifestyles the right to do so. *See* Def. Ex. L at ¶ 7. Thus, defendants argue, a breach of contract claim in this regard would also fail as a matter of law. Plaintiffs counter with Campbell's assertion that she was told that her insurance policy would cover the awards. *See* Pl. Ex. B at 72-75.

to the statements made by defendants in that regard, plaintiffs note that until recently, defendants never charged them for the debts of the subagents. This course of conduct, both word and deed, modified the existing contract. *See Duncan v. Rossuck*, 621 So. 2d 1313 (Ala. 1993) (noting that written agreements may be modified by subsequent oral agreement); *see also Marshall Durbin Farms, Inc. v. Fuller*, 794 So. 2d 320, 325 (Ala. 2000) (noting that course of conduct "in appropriate circumstances, may even override express terms"). Plaintiffs assert that there is a real dispute as to whether defendants' words and conduct modified the written contract. Thus, summary judgment on the breach of contract claim is inappropriate.

## IV.   Unjust Enrichment

### A. Defendants' Position

Defendants argue that a claim for unjust enrichment requires that the "defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Hancock-Hazlett Gen. Constr. Co., Inc. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986). According to defendants, unjust enrichment is properly applied pursuant to the doctrine of quasi-contract or to a contract that is implied-in-law. However, defendants note, "[i]t has long been recognized in Alabama that the existence of an express contract generally excludes an implied agreement relative to the same subject matter." *Vardaman v. Florence City Bd. of Educ.*, 544 So. 2d 962, 965 (Ala. 1989); *see also Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443 (Ala. 1996). Defendants argue that since there is an express contract which addresses the subject matter of the suit, the court cannot find an implied contract. Thus, the unjust enrichment claim fails as a matter of law.

12

B. Plaintiffs' Response

Plaintiffs counter by also citing *Hancock-Hazlett*, but put emphasis on the word *fraud*. Plaintiffs asserts that by misrepresenting the nature of the commission structure to plaintiffs, defendants committed fraud that supports a claim for unjust enrichment.[7]

## CONCLUSIONS OF THE COURT

The court concludes that this is, in essence, a contract action with the real issue being whether the terms of a written contract have been orally modified. The Supreme Court of Alabama has most recently addressed the issue of an oral modification of a written contract in *Ex parte Coleman*, No. 1010644, 2003 WL 1145460 (March 14, 2003). There, the court stated that "under Alabama law a written agreement may be modified by a subsequent oral agreement of the parties, unless some statutory provision provides otherwise. This is so even where the contract contains a requirement that all modifications be in writing." *Id.* at *4 (citations omitted).

For reasons argued by the defendants, there is no substantial evidence of tortious interference with contractual relations. The "conspiracy" allegations are alleged in a mere conclusory fashion. In any event, a civil conspiracy is meaningless unless there was an actual violation. The court finds no substance to the unjust enrichment claim.

In summary, the court will deny the motion as to the breach of contract claim and grant it as to the tortious interference claim, the civil conspiracy claim, and the unjust enrichment claim. The court has not addressed the promissory estoppel and fraud claims.

---

[7] In their Brief, plaintiffs also address their fraudulent inducement and promissory estoppel claims. However, as noted above, defendants filed this Motion for Summary Judgment before plaintiffs amended their complaint. Thus, thus opinion will address only those claims that were part of the original complaint.

13

This \_\_\_\_22nd\_\_\_\_ day of March, 2003.

/s/ Robert B. Propst
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**